# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| LUCIA NORRIS, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 09-C-7284 |
| | ) | |
| v. | ) | Magistrate Judge Susan E. Cox |
| | ) | |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Lucia Norris seeks judicial review of a final decision of the Commissioner of the Social Security Administration ("SSA") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Title II of the Social Security Act ("Act").[1] Plaintiff filed a Motion for Summary Judgment, seeking a judgment reversing or remanding the Commissioner's final decision. For the reasons set forth below, plaintiff's motion is granted [dkt. 20].

## PROCEDURAL HISTORY

On June 16, 2006, plaintiff filed an application for DIB and SSI, alleging that she became disabled on May 15, 2005.[2] Plaintiff's claim was denied on January 22, 2007.[3] Plaintiff then filed a request for reconsideration, which was denied on May 4, 2007.[4] Thereafter, on June 8, 2007, plaintiff requested a hearing before an Administrative Law Judge ("ALJ").[5] Plaintiff's request was

---

[1] 42 U.S.C. § 405(g).
[2] R. at 66.
[3] *Id.*
[4] *Id.*
[5] *Id.*

granted and a hearing took place before ALJ Cynthia Bretthauer on December 5, 2007.[6] Following

the hearing, the ALJ issued an unfavorable decision, finding plaintiff was not disabled at any time

between May 15, 2005 through the date of decision, February 26, 2008.[7] Plaintiff then filed a request

for review of the ALJ's decision with the Social Security Administration Appeals Council

("Appeals Council") on March 28, 2008.[8] The Appeals Council denied review of the ALJ's decision

on September 22, 2009.[9] The ALJ's February 26, 2008 decision, therefore, stands as the final

decision of the Commissioner. Plaintiff filed this action on November 19, 2009.

STATEMENT OF FACTS

**A.    Introduction and Medical Evidence**

This subsection is a brief review of the facts in the medical record that the ALJ reviewed at

plaintiff's hearing and considered when rendering her decision. These facts provide a brief summary

of plaintiff's medical history and the reasons she applied for DIB and SSI.

Plaintiff was born on July 1, 1952, making her fifty-five years old on the date the ALJ issued

her final decision.[10] She finished high school, completed two years of college, and her past relevant

work included a child care provider, administrative assistant, retail sales clerk, welfare to work

counselor, cashier, and park district coordinator.[11] Plaintiff alleged that she became unable to work

on May 15, 2005 due to high blood pressure, pulmonary hypertension, type II diabetes, acid reflux,

and sudden blackouts.[12]

We begin our review of plaintiff's relevant past medical history starting in March of 2005.

---

[6] *Id.*
[7] R. at 66-74.
[8] R. at 13.
[9] R. at 1-3.
[10] R. at 195.
[11] R. at 22, 173.
[12] R. at 172.

On March 4, 2005, plaintiff went to Saint Francis Hospital in Evanston, Illinois ("the hospital") and complained of bilateral leg pain and back pain.[13] She complained that she was unable to walk due to the pain.[14] The radiology report performed on that date reflected no recent fracture, dislocation, bone destruction, or joint effusion.[15] Robert G. Zick, M.D. diagnosed plaintiff with a knee strain and prescribed Vicodin.[16]

On August 17, 2005, plaintiff went to the emergency room of the hospital complaining of a syncopal episode from the previous night, which is a temporary suspension of consciousness due to generalized celebral ischemia.[17] The notes of the plaintiff's primary care physician, Pandelis D. Banias, M.D., reflect that plaintiff woke up at 3:30 a..m., felt dizzy, had a headache, nausea, vomiting, and passed out.[18] She woke up at 5:30 a.m. and could not remember what happened.[19] The notes also indicate that it was the third episode of syncope in the last two months.[20] During the hospital stay, plaintiff did not experience any further episode of weakness or syncope.[21] The hospital's course of treatment was to keep plaintiff on aspirin and discontinue use of Aggrenox.[22] After three nights in the  hospital, plaintiff was discharged on August 20, 2005[23] on the following

---

[13] R. at 239.

[14] *Id.*

[15] *Id.*

[16] R. at 240.

[17] R. at 262; *see also* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1622 (28th ed. 1994).

[18] *Id.*

[19] *Id.*

[20] *Id.*

[21] R. at 263.

[22] *Id.* Aggrenox contains a combination of aspirin and dipyridamole and is used to reduce the risk of stroke in people who have had blood clots or a "mini-stroke." Drugs.com, http://www.drugs.com/aggrenox.html (Last visited December 8, 2010).

[23] R. at 263.

medications: Aspirin, Motrin,[24] Allegra,[25] Prevacid,[26] Potassium chloride,[27] Lasix,[28] Singulair,[29] Atenolol,[30] Zocor,[31] Actos,[32] and Cyclobenzaprine.[33]

Nine days later, plaintiff was admitted to the hospital with complaints of right upper quadrant abdominal pain lasting on and off for about two months.[34] The notes of Dr. Banias reflect that the pain radiated to the back and subsided all by itself.[35] The notes also show that Dr. Banias advised plaintiff to be admitted for gallbladder workup.[36] Additionally, plaintiff complained of another recent syncopal episode.[37] She did not remember having it but was awoken from the floor by her daughter.[38] The notes show that plaintiff had four similar episodes in the past.[39] On September 3, 2005, plaintiff was discharged from the hospital with a low-fat diet and the following medications

---

[24] Motrin is a trademark for the drug ibuprofen. *See* THE AMERICAN HERITAGE MEDICAL DICTIONARY 345 (2008).

[25] Allegra is a trademark for the drug fexofenadine hydrochloride. *Id.* at 20. Fexofenadine hydrochloride is a nonsedating antihistamine used to treat allergic rhitis and allergic skin disorders. *Id.* at 201.

[26] Prevacid is a trademark for the drug lansoprazole. *Id.* at 434. Lansoprazole is a drug of the proton pump inhibitor class. *Id* at 298.

[27] Potassium chloride is a colorless crystalline solid or powder, KCl, used in various pharmaceutical preparations to correct potassium deficiency. *Id.* at 430.

[28] Lasix is a trademark for the drug furosemide. *Id.* at 299. Furosemide is a white to yellow crystalline powder used as a diuretic. *Id.* at 215.

[29] Singulair is a trademark for the drug montelukast. *Id.* at 498. Montelukast is leukotriene receptor antagonist drug that reduces the imflammatory response and is used to treat asthma. *Id.* at 343.

[30] Atenolol is a beta-blocking agent used primarily in the treatment of angina pectoris and hypertension. *Id.* at 48.

[31] Zocor is a trademark for the drug simvastatin. *Id.* at 589. Simvastatin is a stain drug derived from the mold *Aspergillus terreus*, used to treat hyperlipidemia. *Id.* at 498.

[32] Actos is a trademark for the drug pioglitazone hydrochloride. *Id.* at 9. Pioglitazone hydrochloride is ahypoglycemic drug used to treat type 2 diabetes. *Id.* at 415.

[33] Cyclobenzaprine hydrochloride is a skeletal muscle relaxant used to relieve acute muscular spasms. *Id.* at 136.

[34] R. at 258.

[35] *Id.*

[36] *Id.*

[37] *Id.*

[38] *Id.*

[39] *Id.*

prescribed to her: Levaquin,[40] Flagyl,[41] Actos, Zocor, Atenolol, Protonix,[42] Ativan,[43] Lasix, K-Dur,[44] and Aspirin.[45]

On September 25, 2005, plaintiff was admitted to the hospital again, this time with complaints of chest pain.[46] The notes of Dr. Banias reflect that plaintiff's past medical history included congestive heart failure, diabetes mellitus, hypertension, coronorary artery disease, pulmonary hypertension, transient ischemia attacks ("TIA"), osteoarthritis, diverticulitis, syncopal episodes, Bartholin's cyst, Ovarian cyst, and hysterecomy.[47] After evaluation of the plaintiff, the doctor concluded that the chest pain was less likely due to "cardiac cause" and could be more likely caused by musculoskeletal problems.[48] Plaintiff was discharged from the hospital on September 28, 2005.[49] Discharge medications prescribed to the plaintiff included Actos, Zocor, Tenormin,[50] Protonix, Furosemide, K-Dur, Aspirin, Imdur,[51] Naproxen,[52] Nitroglycerine.[53]

On February 21, 2006, plaintiff went back to the hospital complaining of right leg and

---

[40] Levaquin is a trademark for the drug levofloxacin. *See* THE AMERICAN HERITAGE MEDICAL DICTIONARY 305 (2008). Levofloxacin is a synthetic broad-spectrum antibiotic of the fluoroquinolone class. *Id.*

[41] Flagyl is a trademark for the drug metronizadole. *Id.* at 205. Metronizadole is a synthetic antimicrobial drug used in the treatment of vaginal trichomoniasis and intestinal amebiasis. *Id.* at 334.

[42] Protonix is a trademark for the drug pantoprazole sodium. *Id.* at 442. Pantoprazole sodium is a proton pump inhibitor drug used primarily to treat erosive esophagitis and hypersecretory conditions such as Zollinger-Ellison syndrome. *Id.* at 389.

[43] Ativan is a trademark for the drug lorazepam. *Id.* at 48. Lorazepam is a sedative and antianxiety drug used also to treat seizures. *Id.* at 311.

[44] K-Dur is a trademark for an oral prepartion of sustained-release potassium chloride. *Id.* at 291.

[45] R. at 259.

[46] R. at 255.

[47] *Id.*

[48] R. at 256.

[49] *Id.*

[50] Tenormin is a trademark for preparation of atenolol. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 1668 (28th ed. 1994).

[51] Imdur is in a group of drugs called nitrates. Isosorbide mononitrate dilates (widens) blood vessels, making it easier for blood to flow through them and easier for the heart to pump. Imdur is used to prevent angina attacks (chest pain). Drugs.com, http://www.drugs.com/imdur.html (Last visited December 8, 2010).

[52] Naproxen is a drug used to reduce inflammation and pain, especially in treatment of arthritis. *See* THE AMERICAN HERITAGE MEDICAL DICTIONARY 354 (2008).

[53] Nitroglycerine is a thick, pale yellow liquid that is explosive on concussion or exposure to sudden heat. It is used as a vasodilator in medicine. *Id.* at 363; *see also* R. at 256.

groinal pain.[54] This time, she was attended by John T. Piotrowski, M.D., whose notes reflect that plaintiff reported injuring her right leg when she slipped and fell on a toy and did the splits.[55] X-rays on her right knee, right femur, and pelvis were performed and came back negative for fracture, dislocation, or focal bone destruction.[56] Dr. Piotrowski diagnosed plaintiff with a right hamstring strain and prescribed Motrin and Vicodin.[57]

On May 3, 2006, John Vainder, M.D. performed a colonoscopy on plaintiff at the hospital after her complaints of rectal bleeding.[58] The finding of the colonoscopy showed "internal grade I hemorrhoids" and "evidence of moderately severe diverticulosis in the sigmoid."[59] Additionally, the colonoscopy report showed that plaintiff had "[t]wo sessile polyps, measuring 2 mm in size" in her sigmoid.[60] The polyps were removed by cold biopsy polypectomy.[61]

On September 25, 2006, Dr. Banias was asked on a questionnaire from the SSA to describe plaintiff's "ability to do work-related activities such as sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking, [and] traveling."[62] Dr. Banias wrote "Pt. can do the activities mentioned above."[63]

On January 3, 2007, Scott A. Kale, M.D., reviewed the hospital records and examined plaintiff at the request of the Bureau of Disability Determination Services.[64] Dr. Kale's notes reflect that at the time of the review plaintiff's height was 5' 1" and her weight was 242 pounds.[65] Dr. Kale

---

[54] R. at 229.
[55] Id.
[56] R. at 231-33.
[57] R. at 229-30.
[58] R. at 252.
[59] Id.
[60] Id.
[61] Id.
[62] R. at 278.
[63] Id.
[64] R. at 288-91.
[65] R. at 289.

noted that based on plaintiff's account she had a history of multiple syncopal episodes several times per year.[66] The notes also state that these episodes occurred at random times with no warning, and no one has observed her to have a seizure during these episodes.[67] The plaintiff also reported to Dr. Kale the history of intermittent hand and foot numbness, hypertension, several TIAs, acid reflux disorder, and pulmonary hypertension with intermittent shortness of breath.[68] Dr. Kale noted that plaintiff "could walk [fifty] feet without support" and her "gait was not antalgic."[69] Dr. Kale also concluded that plaintiff had normal grip strength and 5/5 strength in the proximal muscles of the upper extremities, and normal range of motion except in the lumbar spine.[70] Finally, under the caption "IMPRESSION" Dr. Kale listed the following as plaintiff's problems:

> Problem #1: History of well-controlled type 2 diabetes.
> Problem #2: History of blackouts for no apparent reason occurring several times per year.
> Problem #3: History of hypertension, well controlled.
> Problem #4: History of gastroesophageal reflux disease.
> Problem #5: Ovarian cancer and hysterectomy, by history.
> Problem #6: Antiogram, by history.
> Problem #7: Osteoarthritis, by history.[71]

Several days later, on January 11, 2007, a CT scan of the plaintiff's head was taken to evaluate her syncope complaint.[72] The impression of the CT scan revealed no acute intracranial hemorrhage, focal mass, or abnormal enhancing lesion.[73] Additionally, a tilt table test was performed on the plaintiff to determine whether her syncope symptoms were due to a neurocardiogenic

---

[66] *Id.*
[67] *Id.*
[68] Id.
[69] R. at 290.
[70] *Id.*
[71] R. at 291.
[72] R. at 356.
[73] *Id.*

origin.[74] The impression of the tilt table test was negative.[75]

On January 17, 2007, Calixto Aquino, M.D. prepared a physical residual functioning capacity assessment ("RFCA") of plaintiff for the SSA.[76] Dr. Aquino concluded that plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand and walk for six hours in an eight-hour workday, sit with normal breaks for six hours in an eight-hour workday, and had a unlimited ability in upper extremities to push or pull.[77] Dr. Aquino also concluded that plaintiff could frequently balance, stoop, kneel, crouch, crawl, and climb ramps and stairs, but could not climb ladders, ropes, scaffolds.[78] Several months later, Harry S. Bennet, M.D. reviewed the medical record and affirmed Dr. Aquino's opinion.[79]

On March 5, 2007, X-rays were taken of both of plaintiff's knees.[80] The radiology report showed few small degenerative spur formations in the left knee and a few tiny degenerative spur formations in the right knee.[81]

On August 1, 2007, plaintiff was admitted to the hospital with complaints of diarrhea and vomiting lasting for six weeks.[82] Plaintiff stayed in the hospital for one week, during which a variety of tests were performed on her. The hospital notes reflect that during the hospital stay plaintiff was managed conservatively for nausea, vomiting, and diarrhea.[83] The notes also indicate that diarrhea and vomiting eventually stopped.[84] Additionally, plaintiff had a renal ultrasound which showed

---

[74] R. at 365.
[75] Id.
[76] R. 279-86.
[77] R. at 280.
[78] R. at 281.
[79] R. at 371-72.
[80] R. at 318-19.
[81] Id.
[82] R. at 383.
[83] R. at 384.

[84] Id.

normal kidneys.[85] On August 8, 2007, plaintiff was discharged from the hospital[86] on the following medications: Atenolol, Montelukast, Simvastatin, Amlodipine,[87] Pantoprazole, Dicyclomine,[88] Aspirin, Lotonsin,[89] and Tylenol.

On November 12, 2007, Dr. Banias filled out a physical residual functional questionnaire.[90] In this questionnaire he stated that plaintiff's symptoms included fatigue, extremity pain and numbness, and muscle weakness. [91] Dr. Banias also stated that plaintiff could walk just one city block without rest or severe pain and sit for forty-five minutes before needing to get up and stand for thirty minutes before needing to sit down.[92] Additionally, Dr. Banias opined that plaintiff could stand/walk less than 2 hours per day, sit about two hours per day, and lift no more than ten pounds.[93] Finally, he concluded that plaintiff would be absent about four days per month due to her impairments.[94]

## B.     The December 5, 2007 Hearing

Plaintiff's hearing before the ALJ occurred on December 5, 2007 in Evanston, Illinois.[95] Plaintiff appeared in person and was represented by her attorney, Nastasia Johnson.[96] A vocational

---

[85] R.374, 384.

[86] R. at 383-84.

[87] Amlodipine besylate is a calcium-channel blocker used in the treatment of hypertension and chronic stable and vasospastic angina. *See* DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 59 (28th ed. 1994).

[88] Dicyclomine hydrochloride is an antocholinergic drug that relaxes smooth muscles and is used as an antispasmodic in the treatment of irritable bowel syndrome and other gastrointestinal disorders. *See* THE AMERICAN HERITAGE MEDICAL DICTIONARY 152 (2008).

[89] Lotonsin is a trademark for the drug benazepril hydrochloride. *Id.* at 311. Benazepril hydrochloride is an ACE inhibitor drug used in the treatment of hypertension, congestive heart failure, and other cardiovascular disorders. *Id.* at 61.

[90] R. at 394-99.

[91] R. at 395.

[92] R. at 396.

[93] R. at 397.

[94] R. at 398.

[95] R. at 16.

[96] *Id.*

expert ("VE"), William Newman, also testified.[97]

After a brief opening statement by plaintiff's attorney, plaintiff testified that she lived in Evanston, Illinois with her nineteen year old granddaughter.[98] Plaintiff testified that the granddaughter was supposed to go away to school, but decided not to because she was scared to leave plaintiff alone due to her sudden blackouts.[99] Plaintiff stated that she did not drive or take public transportation.[100] Responding to the ALJ's query about her education, plaintiff stated that she graduated from high school and completed two years of college.[101]

Next, plaintiff testified that prior to her injury in 2005, she worked as a self-employed home child care provider, administrative assistant, retail sales clerk, welfare to work counselor, cashier, and park district coordinator.[102] Several times during the administrative hearing the ALJ questioned plaintiff whether she worked in 2006, past her alleged injury date.[103] The ALJ emphasized that on several forms, submitted to the SSA by the plaintiff, there was a record of plaintiff's employment in 2006, including the form that reported plaintiff's income in 2006 as $7.181.00.[104] In each instance, plaintiff denied working in 2006.

The ALJ then asked plaintiff to describe her daily activities.[105] Plaintiff testified that her granddaughter did all of the cooking, laundry, dishes, helped plaintiff dress, and get in and out of the bathtub.[106] Plaintiff also testified that the granddaughter started sitting in the bathroom while

---

[97] *Id.*
[98] R. at 21.
[99] R. at 22.
[100] *Id.*
[101] *Id.*
[102] R. at 23-27.
[103] R. at 23-24, 38-41.
[104] R. at 39.
[105] R. at 35.

[106] *Id.*

plaintiff bathed after she once found plaintiff blacked out in the bathtub.[107] Additionally, plaintiff stated that she did not go out of town, and only went to church about three times a year.[108]

Plaintiff testified that her doctors had not yet determined the cause of her dizzy spells.[109] She testified that they could be related to her pulmonary hypertension or high blood pressure.[110] When the ALJ asked plaintiff how far she could walk while using her cane, plaintiff responded that she could walk about two and a half blocks with her cane.[111] Additionally, plaintiff stated that she could stand for fifteen to twenty minutes, sit for a half an hour to an hour, and lift five pounds.[112]

The ALJ then confronted plaintiff with Dr. Banias's assessment of her capacity submitted by Dr. Banias in September 2006.[113] The ALJ told plaintiff that Dr. Banias wrote that plaintiff had the full capacity to do all of plaintiff's daily activities, except extreme extertional activities.[114] Plaintiff could not explain this discrepancy.[115] The ALJ concluded her examination of the plaintiff by confronting her again with her employment records from 2006.[116] After plaintiff denied working in 2006, the ALJ expressed her concern about plaintiff's credibility.[117]

Plaintiff's attorney, Ms. Johnson, then questioned plaintiff.[118] She asked plaintiff about her knee problems, and plaintiff responded that she had osteoarthritis and that her knees hurt on a daily basis.[119] She also testified that to alleviate the pain, she had to lay down, elevate her legs, and use

---

[107] R. at 35-36.
[108] R. at 36.
[109] R. at 30.
[110] *Id.*
[111] R. at 33-34.
[112] R. at 34.
[113] R. at 37
[114] *Id.*
[115] *Id.*
[116] R. 38-41.
[117] R. at 41.
[118] *Id.*

[119] *Id.*

compresses.[120] Plaintiff also testified that she suffered from dizzy spells,[121] type II diabetes,[122] and cramps and swellings in the legs.[123] When asked about sudden blackouts, plaintiff stated that her family members had found her passed out in various places, including the side of her house.[124] Additionally, she mentioned that she suffered from fatigue,[125] as a side effect of her medication, and from diverticulitis,[126] which caused severe cramping, bleeding from her rectum, and going to the bathroom on herself.[127] When asked about other health problems she suffered from, plaintiff named sleep apnea,[128] headaches,[129] high blood pressure,[130] and memory problems.[131]

The VE, William Newman, testified next.[132] First, he testified that plaintiff's past relevant work included semiskilled sedentary (chid care provider), skilled sedentary (welfare to work counselor), unskilled light (cashier, hostess), and semiskilled light (retail sales clerk) work.[133] When the ALJ asked the VE about plaintiff's prior job at the park district, the VE responded that he characterized that job under the child care provider category, semiskilled sedentary level work.[134] When asked about plaintiff's prior job with neighborhood watch, the VE responded that such a job would be considered a security type job, which is semiskilled light work.[135]

The ALJ then asked the VE whether a hypothetical fifty-five year old individual with

---

[120] *Id.*
[121] R. at 43-44.
[122] R. at 42-43.
[123] R. at 43.
[124] R. at 44.
[125] R. at 46.
[126] R. at 45
[127] *Id.*
[128] R. at 46.
[129] R. at 47.
[130] *Id.*
[131] R. at 47-48.
[132] R. at 49-53.
[133] R. at 49-50.
[134] R. at 50-51.

[135] R. at 51.

plaintiff's past work experience, education, and certain exertional limitations would still be able to perform plaintiff's past work.[136] The exertional limitations given by the ALJ consisted of the ability to perform sitting for six to eight hours a day, standing and walking at least six hours a day, lifting and carrying frequently up to twenty five pounds, and occasionally up to fifty pounds.[137] The ALJ also asked the VE to assume that the hypothetical individual cannot climb any ladders, ropes or scaffolds, and must avoid concentrated exposure to unprotected heights and moving and hazardous machinery.[138] The VE responded that such a person would be able to perform plaintiff's past work.[139] The ALJ then changed the exertional limitations and asked the VE to consider a person who could frequently lift and carry ten pounds, occasionally up to twenty pounds and must avoid concentrated exposure to pulmonary irritants.[140] The VE responded that such a person still would be able to perform plaintiff's prior work.[141] When asked to consider a person who is limited to sedentary work with the other limitations and restrictions posed by the ALJ, the VE responded that two jobs (retail sales clerk and cashier) would be excluded.[142]

Plaintiff's counsel then conducted an examination of the VE.[143] She asked the VE to consider a person with blackouts that occur two to three times per month that could last up to three hours, and the VE responded that such a person would be precluded from performing plaintiff's past work.[144]

---

[136] *Id.*
[137] *Id.*
[138] *Id.*
[139] *Id.*
[140] R. at 51-52.
[141] R. at 52.
[142] *Id.*
[143] R. at 53-57.
[144] R. at 53.

**C.    The ALJ's February 26, 2008 Decision**

In her February 26, 2008 decision, the ALJ determined that plaintiff was not under a disability as defined in the Act and, therefore, was not entitled to any DIB and SSI.[145] The ALJ followed the five-step evaluation process outlined in 20 C.F.R. § 404.1520.[146] Under this social security regulation, the ALJ must consider: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[147] A finding of disability requires an affirmative answer at either step three or step five, while a negative answer at any step other than step three precludes a finding of disability.[148]

Initially, the ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2010.[149] At step one, the ALJ reserved a finding as to whether plaintiff had not engaged in substantial gainful activity since May 15, 2005.[150] The ALJ noted that plaintiff's earning record had self-income posted for the year 2006 in the amount of $ 7, 181.00, despite the plaintiff's denial of working past her alleged onset date of May 15, 2005.[151] The ALJ pointed to the Disability Report, in which plaintiff indicated that she performed child care through May 15, 2006, while

---

[145] R. at 74.
[146] R. at 67-68.
[147] 20 C.F.R. § 404.1520.
[148] *Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir. 1992).
[149] R. at 68.
[150] *Id.*

[151] *Id.*

earlier in the same report she indicated the date of May 2005.[152] The ALJ, consequently, stated that she made no finding as to whether plaintiff had engaged in substantial gainful activity after the alleged onset date because it did not alter the ultimate outcome of her decision in the case.[153]

At step two, because plaintiff had type II diabetes, hypertension, history of chronic heart failure, gastroesophageal reflux disease (GERD), sleep apnea, renal disease, diverticulosis, and obesity, the ALJ determined that she had several severe impairments listed in the Act and, thus, met the requirements of step two.[154] Despite finding several severe impairments, the ALJ found that plaintiff failed the third step of the process because she lacked an impairment or combination of impairments that amounted to one of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.[155]

The ALJ next determined plaintiff's residual functional capacity ("RFC").[156] A claimant's RFC represents what a claimant can perform despite his or her physical or mental limitations.[157] The ALJ found that plaintiff had the RFC to perform light work, consisting of the capacity to lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently; and stand and/or walk for at least 6 hours each in an 8-hour workday, and sit 6-8 hours in an 8-hour workday, except plaintiff was unable to climb ladders, ropes, or scaffolds, and needed to avoid environments with concentrated exposure to open heights, moving and hazardous machinery and pulmonary irritants.[158] In the narrative portion of the decision, the ALJ stated that "[w]hile the claimant describes a significantly restricted range of daily activities, these activities cannot be verified with any degree

---

[152] Id.
[153] Id.
[154] R. at 69.
[155] R. at 71.
[156] R. at 71-72.
[157] 20 C.F.R. § 404.1545(a)(1).

[158] R. at 71.

of certainty."[159] The ALJ also stated that plaintiff's allegations were not consistent with the medical record because her claimed symptoms and limitations were significantly in excess of anything described in the record or simply not reflected in the record at all.[160] Specifically, the ALJ noted, "the record contains no complaints of headaches, or observations of blackouts, or medical justification for same."[161] The ALJ further concluded that although plaintiff's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, plaintiff's statements regarding the intensity, persistence, and limiting effects of these symptoms were not entirely credible.[162]

Next, the ALJ stated that she gave little weight to Dr. Banias's opinion and found it inconsistent with the record as a whole.[163] More specifically, the ALJ stated that Dr. Banias's findings were not supported by the objective medical findings as well as his own treatment notes.[164] The ALJ noted that plaintiff's blood pressure reading had been mostly normal and her diabetes was well-controlled.[165] The ALJ also stated that there were only two brief mentions of plaintiff reporting a syncopal episode.[166] She also noted that one of those episodes was due to medication and, otherwise, there were no references to "black-outs" at all.[167] Further, the ALJ found that Dr. Banias never indicated an impairment of any osteoarthritis or degenerative joint disease, and no necessity for an assisting device.[168]

---

[159] R. at 73.
[160] Id.
[161] Id.
[162] Id.
[163] Id.
[164] Id.
[165] Id.
[166] Id.

[167] Id.
[168] Id.

16

Finally, the ALJ gave some weight to the opinions of the state agency physicians, in so far as they determined that plaintiff was not disabled.[169] The ALJ, however, found that the state agency doctors did not adequately consider plaintiff's subjective complaints.[170] The ALJ also stated that because additional evidence was submitted into the record since those doctors rendered their opinions, it diminished the value of those opinions.[171]

Having determined plaintiff's RFC, the ALJ proceeded to step four to determine whether plaintiff could perform any past relevant work.[172] The ALJ noted that plaintiff's past relevant work consisted of jobs with the exertional demands ranging from sedentary to light.[173] The ALJ, accordingly, further found that none of plaintiff's past relevant work required the performance of work-related activities precluded by plaintiff's RFC.[174] Consequently, the ALJ found that plaintiff was capable of performing her past relevant work.[175]

## STANDARD OF REVIEW

The Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[176] In this review, the Court examines the entire record but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ.[177] The Court will uphold the ALJ's decision "if it is supported by substantial evidence and is free from legal error."[178] Substantial evidence is evidence "a reasonable

---

[169] *Id.*
[170] *Id.*
[171] *Id.*
[172] R. at 74.
[173] *Id.*
[174] *Id.*
[175] *Id.*
[176] *Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).

[177] *See Powers v. Apfel*, 207 F.3d 431, 434-35 (7th Cir. 2000).

[178] 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

17

mind might accept as adequate to support a conclusion."[179] Where reasonable minds differ over conflicting evidence, the Commissioner is responsible for determining whether a plaintiff is disabled.[180] However, the Commissioner's decision is not entitled to unlimited judicial deference.[181] An ALJ "must minimally articulate his reasons for crediting or discrediting evidence of disability."[182] The Court conducts a "critical review of the evidence" and will not uphold the ALJ's decision when "it lacks evidentiary support or an adequate discussion of the issues."[183]

ANALYSIS

In her brief, plaintiff argues that the ALJ's decision must be reversed or remanded because the ALJ erred by improperly: (1) giving little weight to the treating physician's report; (2) determining plaintiff's credibility; (3) determining plaintiff's RFC; and (4) failing to analyze plaintiff's obesity in combination with her other impairments. The Court now examines each of these allegations in turn.

**A.      Dr. Banias's Report**

First, plaintiff argues that the ALJ improperly rejected the disability findings of her treating physician, Dr. Banias, who opined in his November 12, 2007 report that plaintiff was limited to standing or walking less than 2 hours per day, sitting about two hours per day, and lifting no more than ten pounds.[184]  The Commissioner argues that the ALJ properly refused to give Dr. Banias's opinion controlling weight because his November 12, 2007 report was not supported by the record

---

[179] *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000) (*quoting Richardson v. Perales*, 402 U.S. 389, 401 (1971)); *Powers*, 207 F.3d at 434.

[180] *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 2000) (*quoting Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987)).

[181] *Clifford*, 227 F.3d at 870 (*quoting Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992)).

[182] *Id.*

[183] *Lopez ex rel. Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003) (*quoting Clifford*, 227 F.3d at 869, and *Steele*, 290 F.3d at 940).

[184] R. at 394-99.

and was inconsistent with his previous opinion.

Traditionally, more weight is given to the opinion of a treating physician because of his greater familiarity with the claimant's conditions and circumstances.[185] If it is well supported by medical findings and not inconsistent with other substantial evidence in the record, a treating physician's opinion regarding the nature and severity of a medical condition is entitled to controlling weight.[186] A claimant, however, is not entitled to disability benefits simply because a physician finds that the claimant is "disabled" or unable to work.[187] Under the Social Security regulations, it is the ALJ who determines the ultimate issue of disability, not a physician.[188]

While the ALJ need not discuss every piece of evidence in the record,[189] the ALJ also may not simply ignore evidence[190] or mischaracterize it.[191] In *Myles v. Astrue*, for example, the Seventh Circuit held that the ALJ erred in finding that plaintiff had not complained of urinary frequency because the ALJ erroneously overlooked two such complaints.[192] In another case, the Seventh Circuit reversed the ALJ's decision because the "ALJ ignored significant evidence supporting [plaintiff's] claim."[193]

In the present case, the ALJ stated that "[t]here are only two brief mentions of claimant reporting a syncopal episode, and one was due to medication, otherwise, there is no reference to 'black-outs' at all."[194] This statement is incorrect. The medical record reflects that on August 17,

[185] 20 C.F.R. § 404.1527(d)(2).
[186] *Id.*
[187] *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001).
[188] 20 C.F.R. § 404.1527(e)(1).
[189] *Dixon*, 270 F.3d at 1176.
[190] *Lopez ex rel. Lopez*, 336 F.3d 535, 540 (7th Cir. 2003).
[191] *Steele*, 290 F.3d at 940.
[192] *Myles v. Astrue*, 582 F.3d 672, 676 (7th Cir. 2009).

[193] *Golembiewski v. Barnhart*, 322 F. 3d 912, 917 (7th Cir. 2003).
[194] R. at 73.

2005 plaintiff was admitted to the hospital after having her third syncopal episode.[195] Dr. Banias's notes from September 3, 2005, additionally, indicate that plaintiff experienced another recent syncopal episode, her fourth one.[196] Thus, although the ALJ acknowledged plaintiff's two syncopal episodes, she mistakenly omitted at least two other syncopal episodes.

Nevertheless, while it is true that the ALJ overlooked two syncopal episodes, consideration of them may not be relevant to plaintiff's disability determination. Syncopes was only reported in Dr. Banias's treatment notes. But Dr. Banias did not identify syncopes, much less suggest limitations from syncopes, in his first disability report in September 2006 or in the second, in November 2007. Both lack any discussion of that part of plaintiff's medical history.

Additionally, plaintiff argues that even if the ALJ did not give Dr. Banias's opinions controlling weight, Dr. Banias's opinions should have been given great weight under 20 C.F.R. § 404.1527(d). Under this social security regulation, the ALJ should look at factors such as length and frequency of the treatment, whether the treating physician is a specialist on the medical issues relevant to the plaintiff, how good of an explanation the treating physician provided, and how consistent the opinion is with the records as a whole.[197] The Commissioner argues that the ALJ properly gave little weight to Dr. Banias's November 2007 opinion because she found that it was inconsistent with Dr. Banias's previous assessment from September 2006.

Although on the first look it appears that Dr. Banias's second assessment contradicts his first assessment, we find that these two assessments, in fact, do not contradict each other. It seems that the confusion regarding Dr. Banias's opinions occurred primarily because different forms were

---

[195] R. at 262.

[196] R. at 258.

[197] 20 C.F.R. § 404.1527(d).

used for these two assessments. In his first questionnaire from the SSA in 2006, Dr. Banias was asked to describe plaintiff's abilities to do work-related activities such as "sitting, standing, moving about, lifting, carrying, handling objects, hearing, speaking, [and] traveling."[198] Dr. Banias wrote "Pt. can do the activities mentioned above."[199] But that assessment form did not specifically ask him to list plaintiff's limitations, whereas the November 2007 form requested plaintiff's physical limitations and required certain details, such as how long plaintiff could sit and stand. It was the November 2007 form that evidenced Dr. Banias's opinion that plaintiff had significant limitations. (And it should be noted that contrary to the ALJ's finding, nowhere in that first assessment did Dr. Banias state that plaintiff had no limitations). Accordingly, we find that the ALJ's conclusive decision, based on the assumption that the forms contradicted each other, warrants further review.

Finally, plaintiff argues that if the ALJ found Dr. Banias's November 2007 opinion to be in "sharp contrast" with his September 2006 opinion, the ALJ had a duty to re-contact Dr. Banias for clarifications. The Commissioner responds that to require an ALJ to re-contact a treating source before rejecting it for deficiencies would be to shift to her the burden that belongs to plaintiff.

Where an applicant is represented by an attorney, the Commissioner may assume that the applicant is making her "strongest case for benefits."[200] Nevertheless, Social Security Ruling 96-5p provides that "[b]ecause treating source evidence (including opinion evidence) is important, if the evidence does not support a treating source's opinion on any issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record, the adjudicator must make 'every reasonable effort' to recontact the source for clarification of the reasons for the

---

[198] R. at 278.

[199] *Id.*

[200] *Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 391 (7th Cir. 1987).

opinion."[201]  Under 20 C.F.R. § 404.1512(e), an ALJ is required to re-contact doctors if the evidence received is inadequate to allow the ALJ to reach a conclusion about whether the applicant is disabled.[202] Furthermore, an ALJ needs to obtain additional evidence or clarification when the medical source's report contains a conflict or ambiguity that must be resolved.[203]

We have already established that on remand the ALJ should reconsider whether Dr. Banias's November 2007 opinion, in fact, contradicts his September 2006 opinion.  Whether the ALJ will need to re-contact Dr. Banias for clarification, then, is something she may consider upon remand.

## B.    The ALJ's Determination of Plaintiff's Credibility

Next, plaintiff contends that the ALJ's credibility determination was erroneous. More specifically, plaintiff  argues that the ALJ erred by improperly: 1) providing "meaningless boilerplate" that plaintiff was not "entirely credible;" 2) rejecting plaintiff's complaints of syncopal episodes; 3) rejecting the diagnosis of osteoarthritis; 4)  concluding that plaintiff's symptoms or limitations were significantly in excess of anything in the record or they were not in the record; and 5)  not performing a pain analysis. The Commissioner responds that the ALJ's credibility determination was not "patently wrong" because she provided reasons for her credibility findings. The Commissioner also argues that she reasonably found the complaints of syncopes from a medically determinable impairment to be less than credible, properly rejected plaintiff's self-reported alleged diagnosis of osteoarthritis, and correctly recognized that plaintiff was "significantly restricted," thus, rejecting plaintiff's claim that her medications should be considered

---

[201] SSR 96-5p.
[202]  20 C.F.R. § 404.1512(e).
[203] 20 C.F.R. § 404.1512(e)(1).

22

in the pain analysis.

An ALJ's credibility determination cannot be invalidated unless it is "patently wrong."[204] In determining whether a credibility determination is "patently wrong," the court examines whether the ALJ's determination was reasoned and supported.[205] The Seventh Circuit explained that an ALJ needs only to "minimally articulate his or her justification for rejecting or accepting specific evidence of disability."[206] "It is only when the ALJ's determination lacks any explanation or support that [a court] will declare it to be 'patently wrong.'"[207] Additionally, when determining credibility, an ALJ must consider the entire case record, including claimant's statements as well as the opinions of treating or examining physicians and other persons.[208] Under Social Security Ruling 96-7p, an ALJ's credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight."[209] Additionally, in determining plaintiff's credibility, an ALJ may not ignore the claimant's statements regarding pain and other symptoms or disregard them merely because they are not substantiated by subjective medical evidence.[210]

## I.    Boilerplate Language

Plaintiff's first argument as to why the ALJ's credibility determination was patently wrong is because the ALJ provided "meaningless boilerplate" language instead of stating specific reasons

---

[204] *Prochaska*, 454 F.3d at 738; *Sims v. Barnhart*, 309 F.3d 424, 431 (7th Cir. 2002).

[205] *See Jens v. Barnhart*, 347 F.3d 209, 213-14 (7th Cir. 2003); *Powers*, 207 F.3d at 435.

[206] *Rice v. Barnhart,* 384 F.3d 363, 371 (7th Cir. 2004) (*quoting Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).

[207] *Elder v. Astrue*, 529 F.3d 408, 413-14 (7th Cir. 2008) (*quoting Jens*, 347 F. 3d at 213).

[208] SSR 96-7p.

[209] *Id.*

[210] *Id.*

why she found plaintiff not "entirely credible." The Commissioner argues that the ALJ adequately

explained her reasoning when she analyzed plaintiff's inconsistent statements regarding her income

and the lack of support for plaintiff's disability from the medical record.

In this case, the ALJ stated that:

> [a]fter considering the evidence of record, the undersigned finds the claimant's medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.[211]

In *Parker v. Astrue*, the Seventh Circuit held that the phrase "not entirely credible," without more,

was meaningless boilerplate.[212] "The statement by a trier of fact that a witness's testimony is 'not

*entirely* credible' yields no clue to what weight the trier of fact gave the testimony."[213] In another

case, *Villano v. Astrue*, the Seventh Circuit similarly found that the ALJ failed "to build a logical

bridge between the evidence and his conclusion that Villano's testimony was not credible" when

the ALJ provided a cursory explanation that Villano's "statements concerning the intensity,

persistence and limiting effects of these symptoms [were] not entirely credible."[214]

Unfortunately in this case, similar to *Parker* and *Villano*, we are left to ponder the exact

reasons for the ALJ's findings. In her decision, the ALJ summarized the history of plaintiff's

medical treatment and recounted plaintiff's testimony regarding her daily activities, all of which are

relevant to a credibility determination.[215] The ALJ, however, did not provide analysis and reasons

as to why she found plaintiff not to be credible.

---

[211] R. at 73.

[212] 597 F.3d 920, 921-22 (7th. Cir. 2010).

[213] *Id.* at 922.

[214] 556 F.3d 558, 562 (7th Cir. 2009).

[215] *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *see also* SSR 96-7p.

Even so, we recognize that there are some problems with plaintiff's credibility. Specifically, there was a discrepancy between plaintiff's live testimony and her employment records. Although plaintiff denied working in 2006, the record reflects that she was, in fact, performing paid child care during that year, after the alleged onset date of her illnesses. After plaintiff could not explain this discrepancy at the administrative hearing, the ALJ expressed her concerns regarding plaintiff's credibility. The Commissioner argues that this is enough. Specifically, the Commissioner states that because the ALJ identified plaintiff's inconsistent statements regarding her income and the lack of support for plaintiff's disability from the medical record, her determination of plaintiff's credibility was not patently wrong.

We acknowledge that the ALJ may have had legitimate concerns regarding plaintiff's credibility. But we cannot uphold her decision on the assumption that the ALJ was basing her credibility determination on plaintiff's contradictory testimony and records. Though we are required to review the entire administrative record, we cannot reconsider facts, re-weigh the evidence, resolve conflicts in evidence, decide questions of credibility, or substitute our judgment for that of the ALJ.[216] And as we noted above, boilerplate language is not sufficient. We must, therefore, ask that the ALJ specify her reasoning.

## II.      Validity of Syncopal Episodes

Plaintiff's next argument is that the ALJ improperly rejected plaintiff's complaints of syncopal episodes. The Commissioner responds that the ALJ reasonably did not find the complaints of syncopes to be credible because Dr. Banias did not identify syncopes in his reports, or suggest limitations from syncopes. We have already established that plaintiff's syncopal episodes may not

---

[216] *See Boiles v. Barnhart*, 395 F.3d 421, 425 (7th Cir. 2005); *Clifford*, 227 F.3d at 869.

even be relevant to plaintiff's disability determination. But for the sake of completeness, we will review plaintiff's arguments.

In her decision, the ALJ stated that "the record contains no...observations of blackouts or medical justification for same."[217] Plaintiff attacks this finding with two arguments. First, plaintiff argues that the fact that plaintiff did not have syncopal episodes during her doctor's visits was not a proper ground for rejecting her complaints. On this point plaintiff cites *Raub v. Barnhart*, where the court held that "the ALJ's rationale that Plaintiff lacked credibility, in that, he did not have any panic attacks in his physicians' offices...cannot prevail. There is no evidence in the record to indicate that an individual suffering from panic attacks would be expected to experience such an attack in his treating physicians' offices."[218]

Second, plaintiff argues that it was not proper for the ALJ to rely on a lack of established etiology of plaintiff's syncopal episodes. For this plaintiff cites *Parker v. Astrue*, where the Seventh Circuit held that "one can't infer from the inability of a person's doctor to determine what is causing her pain that she is faking it."[219]

It does not seem that with the ALJ's one-sentence statement concerning a lack of observation of blackouts, or the lack of medical explanation for them, the ALJ intended to suggest that plaintiff was faking her injury. Also, we do not think that the ALJ expected plaintiff to experience syncopal episodes during her hospital stay and doctors' visits. It appears that by stating that the "the record contains no...observations of blackouts or medical justification for same" the

---

[217]R. at 73.
[218]2002 WL 1793744, at * 10 (N.D. Ill. Aug. 2, 2002).

[219]597 F.3d 920, 922 (7th Cir. 2010); *see also Villano*, 556 F.3d at 562; *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006).

ALJ simply summarized the evidence that plaintiff's alleged syncopes were not witnessed and there was no medical explanation for them. More importantly, in her decision, the ALJ did not state that she found plaintiff less credible because the syncopes were unobserved or lacked medical explanation.

## III.     Osteoarthritis

Plaintiff's next argument is that the ALJ improperly rejected the diagnosis of osteoarthritis. Plaintiff argues that the ALJ made her own independent determination when she found that radiograph findings of plaintiff's knees "may support a diagnosis of mild osteoarthritis," and that there was no objective evidence that arthritis significantly limited plaintiff's ability to ambulate effectively. The Commissioner responds that because plaintiff was never properly diagnosed with osteoarthritis, the ALJ correctly rejected her self-reported alleged diagnosis.

Social Security Ruling 96-7p provides that "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms."[220] We believe that the ALJ did not "play doctor" in rejecting the diagnosis of osteoarthritis. In her decision, the ALJ discussed in great detail the history of plaintiff's visits to the hospital with complaints regarding her knees.[221] Additionally, before rejecting the diagnosis of osteoarthritis, the ALJ described several negative clinical evaluations and other tests plaintiff underwent.[222] Furthermore, although Dr. Banias stated several times in his notes

---

[220] SSR 96-7p.
[221] R. at 70.
[222] *Id.*

that plaintiff had a history of osteoarthritis,[223] in his assessment submitted to the SSA he did not mention plaintiff's osteoarthritis.[224] Because the plaintiff's history of osteoarthritis was self-reported and not mentioned by Dr. Banias in his assessment report, and in the view of other medical evaluations and tests available in the record, the ALJ had a reason not to accept the diagnosis of osteoarthritis. The Court, accordingly, finds that because the ALJ minimally articulated her reasons for not accepting the diagnosis of osteoarthritis, her credibility determination concerning osteoarthritis must be upheld.[225]

## IV.     Plaintiff's Symptoms and Limitations

Next, plaintiff argues that the ALJ improperly concluded that plaintiff's symptoms or limitations were significantly in excess of anything in the record, or they were not in the record. Plaintiff argues that the ALJ failed to describe how plaintiff's symptoms or limitations were inconsistent with the record. The Commissioner does not respond to this argument.

While plaintiff makes an argument that the ALJ improperly found her symptoms or limitations to be inconsistent with the medical record, she does not specify what symptoms and limitations the ALJ found to be unsupported. And contrary to plaintiff's argument, we find that the ALJ sufficiently articulated her reasons for finding some of the plaintiff's symptoms and limitations to be significantly in excess of anything in the record, or not in the record at all. For example, the ALJ stated that the record contained no complaints of headaches or observations of blackouts or a medical justification for them.[226] The ALJ also stated that there was no evidence of loss of bowel

---

[223] R. at 255, 258, 262.
[224] R. at 394-402.
[225] *See Clifford*, 227 F.3d at 870 (*quoting Scivally*, 966 F.2d at 1076) (stating that the ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability").

[226] R. at 73.

control and no justification for the need to use an assistive device.[227] Because plaintiff did not specify what symptoms and limitations the ALJ improperly considered and the ALJ articulated at least minimal reasons why she found some of the claimed symptoms to be in excess of anything described in the record, we find no reversible error here.[228]

## V.     Pain Analysis

Finally, plaintiff argues that if the ALJ found plaintiff's symptoms or conditions to be in excess of anything described in the record, she still was required to perform a pain analysis. Plaintiff argues that the ALJ failed to consider plaintiff's daily activities and the amount of pain medication she was taking. The Commissioner responds that the ALJ reasonably recognized that plaintiff was "significantly restricted" and properly rejected plaintiff's claim that her medications should be considered because the mere fact that plaintiff took medications did not establish any limitations affecting her ability to work.

In *Zurawski v. Halter*,[229] the Seventh Circuit stated:

> If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that relate to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.[230]

---

[227] *Id.*

[228] *See Clifford*, 227 F.3d at 870 (*quoting Scivally*, 966 F.2d at 1076) (stating that the ALJ must "minimally articulate his reasons for crediting or rejecting evidence of disability").

[229] 245 F.3d 881, 887 (7th Cir. 2001).

[230] *Id* (*quoting Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994) (citation omitted)).

The ALJ, thus, is required to analyze the factors mandated by the *Zurawski* court when plaintiff "indicates that pain is a significant factor of his or her alleged inability to work."[231] Here, while plaintiff alleged that she became unable to work due to high blood pressure, pulmonary hypertension, type II diabetes, acid reflux, and sudden blackouts, she did not indicate that she experienced pain as a consequence of her alleged ailments. Additionally, there is nothing in the record to suggest that the alleged syncopal episodes, which plaintiff claims preclude her from working in child care, are associated with pain. For this reason, we find that the ALJ was not obligated to perform a pain analysis and obtain detailed descriptions of plaintiff's daily activities, the amount of pain and other medication she was prescribed, and analyze other factors mandated by the *Zurawski* court.

Because the ALJ was not obligated to consider factors under the *Zurawski* court in the first place, we do not have to address plaintiff's argument that the ALJ erred in not considering her daily activities and the amount of medication she was taking. Nevertheless, for the sake of completeness, we will again briefly discuss plaintiff's arguments.

First, with regard to plaintiff's daily activities, the ALJ did, in fact, summarize what plaintiff testified she could do. Specifically, in a separate paragraph, the ALJ described them in great detail.[232] The ALJ concluded that "while the claimant describes a significant restricted range of daily activities, these activities cannot be verified with any degree of certainty."[233]

Second, plaintiff argues that the ALJ erred by not analyzing medications prescribed to her. In response, the Commissioner cites a recent case, *Schaaf v. Astrue*, where the Seventh Circuit

---

[231] *See id.*

[232] R. at 73.

[233] *Id.*

noted that "it would be speculation to assume" that a claimant actually suffers from certain side effects of a particular medication if none are mentioned or discussed.[234] While we agree with plaintiff that *Schaaf* deals primarily with side effects of medications, which is not at issue here, we, nevertheless, find that the Commissioner properly cited this case for the general principle that taking medications does not establish limitations on plaintiff's working abilities.[235] Here, the medical records show that although plaintiff was prescribed a whole host of medications, the only pain medication prescribed to her was Naproxen, which she later stopped taking due to allergic reactions.[236] Therefore, the ALJ did not err when she did not analyze the medications prescribed to plaintiff.

## C.      The ALJ's Determination of Plaintiff's RFC

Plaintiff next argues that the ALJ's determination of plaintiff's RFC was improper. Plaintiff argues that because the ALJ had no medical basis for her findings, the RFC she constructed for plaintiff was not proper. The Commissioner responds that the ALJ adequately explained her reasoning and the ALJ's RFC findings were supported by substantial evidence because the ALJ explicitly relied on opinions of the state agency physicians, except to give more credit to plaintiff's subjective complaints.

In determining RFC, ALJs evaluate the claimant's age, ability to lift weight, sit, stand, walk, push, pull, and any other factors that would be helpful in gauging the claimant's ability to perform sedentary, light, medium, heavy or very heavy levels of work.[237] Although it is a responsibility of

---

[234] 602 F.3d 869, 876 (7th Cir. 2010).
[235] *See id.*
[236] R. at 29.

[237] 20 C.F.R. § 404.1567.

the ALJ, as a finder of fact, not a physician, to determine plaintiff's RFC,[238] the ALJ must consider both medical and nonmedical evidence in the record.[239] The ALJs are not permitted to construct a "middle ground" RFC without a proper medical basis.[240] Additionally, under SSR 96-8p, ALJs are required to explain how they arrived at their conclusions regarding claimant's RFC.[241] "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)."[242]

In the present case, Dr. Aquino, the state agency physician, opined that plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds, stand and walk for six hours in an eight-hour workday, sit with normal breaks for six hours in an eight-hour workday, and had a unlimited ability in upper extremities to push or pull.[243] Dr. Banias, plaintiff's primary care physician, however, concluded that plaintiff could stand or walk less than two hours per day, sit about two hours per day, and lift no more than ten pounds.[244] But he ALJ discredited Dr. Banias's findings and gave little weight to his opinion, stating that it was inconsistent with the record as a whole.[245] Thereafter, she went on to explicitly state that she relied on the findings of the state agency doctors only as to their determination that plaintiff was not disabled.[246] The ALJ stated that the state agency doctors did not adequately consider plaintiff's subjective complaints.[247]

---

[238] 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2).
[239] 20 C.F.R. § 404.1545.
[240] *Bailey v. Barnhart*, 473 F. Supp. 2d 822, 838-39 (N.D. Ill. 2006).
[241] *Briscoe v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005) (*quoting Lopez*, 336 F.3d at 539).
[242] SSR 96-8p.
[243] R. at 280.

[244] R. at 394-99.
[245] R. at 73.
[246] *Id.*
[247] *Id.*

Additionally, the ALJ stated that these doctors had not been able to consider the additional evidence that was submitted into the record after they rendered their opinions.[248]

After discrediting these two RFC assessments, the ALJ constructed her own RFC assessment. She concluded that plaintiff retained the RFC to:

> lift/carry/push/pull up to 20 pounds occasionally and 10 pounds frequently; and stand and/or walk for at least 6 hours each in an 8-hour workday, and sit 6-8 hours in an 8-hour workday, except the claimant was unable to climb ladders, ropes, or scaffolds, and needed to avoid environments with concentrated exposure to open heights, moving and hazardous machinery and pulmonary irritants.[249]

What the ALJ, however, failed to do was to provide an explanation as to how she arrived at these conclusions. After the ALJ discredited the opinions of Dr. Banias and the state agency doctors regarding plaintiff's RFC, she was then required to call a medical expert or, alternatively, explain what other medical basis she relied on in making plaintiff's RFC determination.[250] It is not clear what medical evidence the ALJ relied on to support her RFC findings because she did not articulate those grounds in her decision. Without more, we can only assume that she was relying on her own opinion. On this basis, then, remand is warranted for clarification.

**D.    The ALJ's Duty to Analyze Plaintiff's Obesity in Combination with Her Other Impairments.**

Finally, Plaintiff argues that the ALJ's failure to consider plaintiff's obesity in combination with her other impairments warrants reversal of the ALJ's decision. The Commissioner responds that because the ALJ discussed plaintiff's obesity and relied on Dr. Kale's consultative examination, who also noted plaintiff's weight at 242 pounds in his notes, the ALJ properly considered obesity alongside plaintiff's other impairments.

---

[248] *Id.*
[249] R. at 71.
[250] *Bailey*, 473 F. Supp. 2d at 838-39.

Under Social Security Ruling 02-1p, obesity is a medically determinable impairment and adjudicators must take its effects into consideration when evaluating disability.[251] "[T]he combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately."[252] For this reason, obesity must be considered for its incremental effect combined with other impairments.[253] "[T]he ALJ must specifically address the effects of obesity on a claimant's limitations because, for example, a person who is obese and arthritic may experience greater limitations than a person who is only arthritic."[254] In *Barrett v. Barnhart*, for example, the Seventh Circuit held that even if plaintiff's "arthritis was not particularly serious in itself, it would interact with her obesity to make standing for two hours at a time more painful than it would be for a person who was either as obese as she or as arthritic as she but not both."[255]

Here, the ALJ found that plaintiff's obesity was a "severe" impairment when she noted in her opinion that "the claimant carries a diagnosis of obesity, with a measured height 5 feet 1 inch, and weight of approximately 244 pounds."[256] Under Social Security Ruling 02-1p, people with a body mass index ("BMI") over 40.0 are considered to have Level III or "extreme" obesity.[257] Because plaintiff here is 5 feet 1 inch and 244 pounds with a BMI of 46.1, she is considered to have Level III obesity.[258] Although the ALJ recognized plaintiff's extreme obesity, nowhere in her decision did she address the effect of plaintiff's obesity in combination with her other impairments. The Commissioner argues that the ALJ considered plaintiff's obesity when she relied on the

---

[251] *See* SSR 02-1p.
[252] *Id.*
[253] *Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005).
[254] *Villano*, 556 F.3d at 562.
[255] 355 F.3d 1065, 1068 (7th Cir. 2004).

[256] R. at 70.
[257] *See* SSR 02-1p.
[258] R. at 70; *see also* SSR 02-1p.

opinions of the state agency physicians who in turn relied on the consultative examiner who recorded plaintiff's weight. In his notes, Dr. Kale recorded plaintiff's height and weight at 5' 1"and 242 pounds.[259] Dr. Kale, however, only recorded plaintiff's weight and height, nothing more. As plaintiff correctly observes, recording a patient's weight is a normal part of any physical exam and, therefore, does not constitute a consideration of plaintiff's extreme obesity.

The Commissioner cites *Skarbek v. Barnhart*[260] to support his position. In *Skarbek*, the Seventh Circuit held that "although the ALJ did not explicitly consider Skarbek's obesity, it was factored indirectly into the ALJ's decision as part of the doctor's opinions."[261] That case, however, is distinguishable. First, in *Skarbek*, the plaintiff was at the lowest level of obesity, Level I.[262] Here, plaintiff is at the highest level of obesity, which is Level III. It is, therefore, more likely that plaintiff's obesity in this case could significantly impact her other impairments, and her ability to work, as compared to the plaintiff in *Skarbek*. Second, in the present case, plaintiff identified specific conditions that could be exacerbated by her obesity (osteoarthritis, pain, pulmonary hypertension, and coronary artery disease), whereas in *Skarbek* the plaintiff did not identify how his obesity further impaired his ability to work.[263]

Also important in this analysis is that, here, plaintiff has a host of significant medical conditions, including type II diabetes, chronic heart failure, hypertension, sleep apnea, renal disease, diverticulitis, and GERD. Because the ALJ found that one or more of plaintiff's impairments was "severe," the ALJ had a duty to consider "the aggregate effect of this entire

---

[259] R. at 289.
[260] 390 F.3d 500, 504 (7th Cir. 2004).
[261] *Id.*
[262] *Id.*

[263] *Id.*

constellation of ailments - including those impairments that in isolation are not severe."[264] Therefore, because the ALJ concluded that plaintiff was capable of performing light work and could stand or walk for six hours, without analyzing the combined effect of plaintiff's obesity with her other impairments, remand on this ground is also warranted.

[264] *See Golembiewski*, 322 F.3d at 918 (*citing* 20 C.F.R. § 404.1523); *see also Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000).

CONCLUSION

For the reasons set forth above, plaintiff's Motion for Summary Judgment is granted [dkt. 20]. This case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Date: <u>March 2, 2011</u>

U.S. Magistrate Judge
Susan E. Cox